IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHARLES LEE CRAFT, | ) | |
| Petitioner, | ) | No C 04-4226 JSW (PR) |
| | ) | |
| vs. | ) | ORDER DENYING PETITION |
| | ) | FOR A WRIT OF HABEAS |
| GEORGE STRATTON, Warden, | ) | CORPUS |
| | ) | |
| Respondent. | ) | |
| ——————————————— | ) | |

## INTRODUCTION

Charles Lee Craft , a state prisoner currently incarcerated at Kern Valley State Prison in Delano, California, filed this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutional validity of his state conviction. Per order filed on January 12, 2005, the court found that the petition, when liberally construed, stated a cognizable federal habeas action under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer. Petitioner subsequently filed a traverse. This *pro se* habeas petition is now before the court for consideration of the claims on the merits. For the reasons discussed below, the petition is denied.

## PROCEDURAL BACKGROUND

On August 9, 2000, Petitioner was convicted in Lake County and was sentenced to life without possibility of parole. Court Transcript ("CT") at 4386, 5434. Petitioner was found guilty of first-degree murder and the allegation of personal use of a firearm. At a trial on the special circumstances of a prior

1   murder and the allegation of a prior serious felony on August 14, 2000, the jury

2   found the special circumstances to be true.

3       The California Court of Appeal affirmed the judgment on April 17, 2003

4   and the Supreme Court of California denied review on July 9, 2003.  Petitioner

5   timely filed the instant federal petition for a writ of habeas corpus.  This court

6   has subject matter jurisdiction over this habeas action under 28 U.S.C. § 2254

7   and, because Petitioner was convicted in Lake County, this action is in the proper

8   venue.

9                            **FACTUAL BACKGROUND**

10      The California Court of Appeal summarized the facts underlying the case

11  as follows:

12      In 1995, defendant was hired by Richard and Kathleen Sacks as a
        caretaker for their 245-acre ranch in Lake County. Among the
13      buildings situated on the property were a dilapidated yellow
        farmhouse and a double-wide mobile home. Defendant was allowed to
14      live in the mobile home, but defendant was to use only one of the three
        bedrooms.
15
16      The Sacks family had plans to move gradually from their ranch in
        Hollister onto the Lake County property, and over the course of
17      several months in 1996 the family brought carloads of belongings and
        stored them in the yellow house and in the master bedroom of the
        mobile home. The Sackses' daughter, Desiree, was planning to move
18      into the upper story of the yellow house, and she brought most of her
        possessions to the ranch. They were stored in cardboard boxes
19      carefully arranged along the sides of the upstairs room. Desiree also
        brought up a dresser, and she placed a music stand on top of it.
20
21      Richard and Kathleen Sacks were planning to live in the mobile home.
        Kathleen Sacks had several boxes of expensive rock quartz crystals
22      that were placed in a small closet in the master bedroom. Richard
        Sacks had a collection of about 15 reptiles (snakes and lizards) housed
        in aquarium-type cages. They were put along the walls in the master
23      bedroom, and two mirrored closet doors were removed to make room
        for reptile cages in the larger closet. The Sackses also brought some
24      tools, including a Weed-Eater, and fishing equipment.

25      The Sackses imposed certain rules for defendant: no smoking, no
        drinking, no dogs, no visitors. Despite those restrictions, in May 1996,
26      defendant agreed to let Gerald Hebert stay on the ranch at the request
        of a mutual friend, Joan Turner. Defendant was not happy with the
27

28                                        2

arrangement. He told his friend Tracy Demato at one point that things were "bad" between him and Hebert and he was going to ask Hebert to move. On another occasion, defendant told Demato that he had gotten Hebert's food stamps and Hebert would be angry.[2]

In late August 1996, Hebert went to San Francisco for about two weeks to work on a plumbing job with his friend, William Lyons. Hebert was paid $300 in cash. Although he spent some of the money, he returned to Lake County with about $200 in his wallet. William Lyons brought Hebert back to the ranch and also brought a futon that Hebert had retrieved from storage in San Francisco.

On August 31, Joan Turner telephoned the Sackses' ranch and spoke to defendant, who volunteered to pick up Hebert's food stamps. Mrs. Turner did not feel comfortable with that arrangement and declined the offer. She later reached Hebert, who bicycled into town to get his food stamps. Hebert was last seen by Joan Turner's husband riding his bicycle in Clearlake on Saturday afternoon, August 31, 1996.

On Friday, September 6, 1996, the Sackses arrived at the ranch with another load. On their arrival, defendant told the Sackses someone had broken into the house. While Richard Sacks unloaded their goods, Kathleen Sacks, her daughter Desiree, and her niece Julie went walking on the property. They soon came upon two dogs who had uncovered the body of a man partially buried in a large hole by the creek.[3] The dead man was not immediately identifiable, as he had no wallet and an empty, unzipped fanny pack was buried with him. Through fingerprints, the sheriff's investigators identified him as Gerald Hebert. The fanny pack was later identified as belonging to Hebert.

Hebert had been buried in the hole without shoes. A pair of bloody tennis shoes of the type worn by Hebert were found in a garbage pile on the Sackses' ranch inside a broken terrarium. Through DNA tests, the blood on the tennis shoes was found to match Hebert's DNA.[4]

_____

[2] Joan Turner had helped Hebert apply for food stamps, which were mailed to her in Clearlake every month. She would then telephone Hebert and he would ride into town to get them. Once defendant picked up Hebert's food stamps instead.

[3] One of defendant's assigned tasks as caretaker had been to fill in that hole to make the area safe for the horses the Sackses intended to have on the ranch.

[4] Due to the body's state of decomposition, none of the victim's blood was available for matching. DNA samples were obtained from bone, teeth, and pubic hair.

Hebert's empty wallet was later found in the closet of defendant's bedroom of the mobile home. His driver's license, social security card, and other identity cards were found, along with a plastic insert that had been in the wallet, in the garbage outside the rear door of the mobile home.

The sheriff's investigators obtained from Willie Harris a red duffle bag with a Marlboro logo that defendant had left with him on the day the body was found. The bag had belonged to Hebert. Defendant later consented to a search of that bag, and inside the investigators found shoes belonging to Desiree Sacks.

Hebert's blood-splattered bicycle was later retrieved by the investigating sheriff's deputies from the home of Willie Harris, a friend of defendant. A blood-stained tent was located on the Sackses' ranch between the mobile home and the trash dump. The blood on the tent matched Hebert's DNA, as did blood stains found on Hebert's bicycle and on one of defendant's leather boots.

The forensic examination revealed that Hebert had been killed by gunshot wounds several days before his body was found. One shot entered his back and traveled upward. The position of the wound, together with the blood splatters on the bicycle, suggested that Hebert had been shot while hunched over sitting on his bicycle. The second shot would have been instantly fatal; it grazed Hebert's shoulder and entered the base of his skull. The bullet removed from Hebert's skull came from an 8-millimeter rifle.

On the day she discovered Hebert's body, Kathleen Sacks realized that, despite her instructions to defendant, someone else had been living in the mobile home. She found men's clothing, boots, and bedding in the back bedroom. She and her husband also discovered that the yellow house had been burglarized. Desiree's boxes had been ransacked. Defendant was apologetic and assured the Sackses that he had an 8 millimeter rifle and could take care of the problem. Kathleen Sacks was furious with defendant and told him to pack up his things.

That same day, when Hebert's body was found, defendant told the investigating officers that he lived alone and no one had been on the ranch for about a month. A week later, on September 14, 1996, Deputies Stein and Navarro questioned defendant at the home of defendant's girlfriend. Defendant acknowledged that Hebert had been living in the mobile home, but he explained that he had not wanted to reveal that information because his employers did not want anyone else on the property. Defendant said he had last seen Hebert about a week before the body was discovered. He assumed that Hebert had moved back to San Francisco, as his futon, backpack and bicycle were gone. Defendant admitted putting the broken aquarium in the garbage dump, and he said he thought he had put Hebert's shoes inside the aquarium.

Also on September 14, the Sackses arrived at the ranch with another load. They found the mobile home padlocked and all of defendant's belongings gone. Also gone were all the reptiles, all the rock crystals,

some items from the living room, virtually all the tools from the barn, and substantial amounts from the yellow house. The missing items included china, cookware, jewelry, art supplies, figurines, videotapes, romance novels, fishing equipment, a sewing machine, and the mirrored closet doors.

Several days earlier, defendant's friend, Allen Madden, agreed to let defendant stay temporarily in an empty camper shell in his yard. Madden helped defendant transport two truckloads of belongings from the Sacks ranch to Madden's property. Defendant's friend, Tracy Demato, later helped defendant move more goods to Madden's yard. Among the items she helped move were several cardboard boxes and some mirrored closet doors. In the course of the move, defendant offered to sell Demato a futon bed.

As the days passed, Allen Madden noticed that more and more goods kept appearing in his yard around the camper shell. Madden became suspicious that defendant was bringing stolen property into the yard, and he began to look through some of the things. Underneath a disabled truck Madden found a zippered rifle case. Madden suspected the rifle might be the murder weapon. Defendant had displayed an 8-millimeter rifle in just such a case to Allen Madden at the Sackses' ranch about a week before Hebert's body was discovered. Defendant told Madden then that he wanted to trade the rifle for a pistol.

Tracy Demato, too, had seen defendant with a rifle in her visits to the Sacks ranch. One time defendant was shooting into a hay bale with the rifle propped up on a music stand. Defendant told her it was an 8-millimeter rifle. Another time Demato saw the rifle in defendant's bedroom. Defendant kept the rifle in a brown zippered case.

Allen Madden eventually turned the zippered rifle case over to sheriff's deputies. And, after obtaining a search warrant, the investigators opened the case to retrieve the rifle. That rifle was determined to be the murder weapon. It had originally belonged to William Lyons, a longtime friend of Hebert. In late August 1996, Lyons visited Hebert at the Sacks ranch after a hunting trip, and Hebert asked to borrow the rifle so that he could shoot some deer. Lyons left the rifle in its brown zippered case with Hebert.

On September 28, 1996, defendant was arrested on unrelated charges and held in custody. A few days later, on October 2, sheriff's investigators went to the Madden home and took away a truckload of boxes identified by the Maddens as brought by defendant. Allen Madden also gave the officers a sewing machine and some artist's paints that defendant had given to the family. The officers later took more items from the camper shell pursuant to a search warrant. Among the items taken was a pair of blood-stained leather boots that the officers recognized as those defendant had been wearing in his interview on September 14. And, the officers took a gray contractor's nail pouch that was identified as Hebert's.

5

Numerous items seized from the Madden property were identified by the Sackses as stolen from their ranch. The officers also recovered several stolen items (a music stand, books, videotapes, statues, vases) that defendant had given to Tracy Demato. And, they retrieved several stolen rock crystals that defendant had given to other friends. The stolen items were returned to the Sackses.

While defendant was still living at the ranch, defendant told Tracy Demato that he was selling the Sackses' snakes and other goods to pay some bills, and he was mad at Hebert because Hebert had threatened to tell the Sackses defendant was selling their snakes.[5]  Later, after defendant moved to Allen Madden's yard, defendant told Demato that he had shot Hebert.

Defendant also told Allen Madden he had killed Hebert. Defendant explained that he had been angry at Hebert because Hebert had threatened to tell the Sackses that he was selling drugs and not doing the work. Hebert wanted to take over defendant's caretaker job. Defendant told Madden he shot Hebert twice. But he found he could not move the body alone, so he asked Willie Harris to help. The two men used a tarp to wrap the body and put it in Harris's truck. Then they drove to the hole by the creek and buried the body.

Defendant was interviewed by sheriff's investigators on January 15, 1997, and admitted that he took some of the Sackses' reptiles and exchanged them for "crank." He also admitted taking a dragon statue and some of the rock crystals, selling some, and trading others for some "dope."[6]   But defendant said he gave away most of what he took, making only enough money to buy cigarettes. Defendant admitted shooting the 8-millimeter rifle at the ranch, but he said he told Hebert to get rid of the rifle and he did not know where it was.

*People v. Craft*, No. A92932, 2003 WL 1889986 at **1-4 (Cal. Ct. App. April 17, 2003).

---

[5]  Sometime in early September defendant sold several snakes and a lizard in their cages to John Campbell (then age 17), who had expressed an interest in them after seeing them during a visit to the ranch. The reptiles were returned to the Sackses.

[6]  During a visit to the Sackses' ranch to see her friend Hebert, Annilee Allen saw and admired several quartz crystals in defendant's bedroom. Later, defendant came to her house in Clearlake and offered to sell her some of the crystals. Ms. Allen paid $100 for one, but could not afford to buy any others. Defendant left the rest of the crystals with her nonetheless. Sometime in late August, Ms. Allen's boyfriend, William Lyons, let defendant take back the crystals.

Defendant also offered to sell some rock crystals to Tracy Demato, but she declined.

**STANDARD OF REVIEW**

This Court may entertain a petition for habeas relief "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Based on this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28

7

1  U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme

2  Court as of the time of the state court decision.  *Id.* at 412; *Clark v. Murphy*, 331

3  F.3d 1062, 1069 (9th Cir. 2003).

4        In deciding whether a state court's decision is contrary to, or an

5  unreasonable application of, clearly established federal law, a federal court looks

6  to the decision of the highest state court to address the merits of the petitioner's

7  claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th

8  Cir. 2000).  Because the Court finds that Petitioner does not present any

9  cognizable claims, the petition for a writ of habeas corpus is denied on the

10  merits.

11                    **DISCUSSION**

12        In his petition for writ of habeas corpus, Petitioner raises the following

13  grounds for relief: (1) the trial court violated Petitioner's due process rights by

14  failing to properly instruct the jury regarding felony-murder; (2) the trial court

15  admitted Petitioner's statement in violation of *Miranda v. Arizona*, 384 U.S. 436

16  (1966); (3) the trial court's admission of evidence of Petitioner's drug use and

17  drug sales violated his rights to due process and a fair trial; (4) the trial court's

18  refusal to turn over personnel records of one witness violated Petitioner's right to

19  due process and to confront and cross-examine that witness; (5) Petitioner

20  suffered ineffective assistance of counsel due to counsel's failure to request a

21  mistrial; (6) cumulative error; and (7) the trial court's sentencing Petitioner to

22  life without parole due to a prior out-of-state conviction violated Petitioner's due

23  process rights.

24  **A.    Improper Jury Instruction**

25        Petitioner argues that the jury instructions on felony murder violated due

26  process because the jury was not instructed that theft is a lesser offense included

27

28                    8

within robbery.  At trial, the prosecution presented two alternate theories of first degree murder:  premeditated murder and murder during the commission of a robbery.  Because the jury returned a general verdict and did not specify which particular first-degree murder theory they relied on, Petitioner alleges that an improper felony murder instruction would necessarily nullify his conviction. CT at 5269.  We find that the jury was adequately instructed on the timing of intent to steal and Petitioner's argument is without merit.

### 1. Legal Standard

To obtain federal relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so frustrated the entire trial that the resulting conviction violates due process. *Id.* at 72; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must establish not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right]"). The omission of an instruction is less likely to be prejudicial than a misstatement of law. *Murtishaw v. Woodford*, 255 F.3d 926, 971-72 (9th Cir. 2001). Moreover, the instruction may not be judged in isolation, but must be considered in the context of the instructions as a whole. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982).

Further, a jury instruction that omits an element of an offense is a constitutional error subject to harmless error analysis. *Neder v. United States*, 527 U.S. 1, 8- 11 (1999); *Evanchyk v. Stewart*, 340 F.3d 933-940 (9th Cir. 2003) (holding that the harmless error analysis is also applicable to § 2254 cases).  The omission will be found harmless unless it "had a substantial and

9

1    injurious effect or influence in determining the jury's verdict." *California v. Roy*,

2    519 U.S. 2, 4 (1996).

3        **2. Analysis**

4        Without being instructed that theft is a lesser-included offense of

5    robbery, Petitioner argues that the jury did not consider whether his intent to

6    steal arose after the killing.  If the jury was permitted to consider the lesser

7    crime of theft, Petitioner contends that the jury would not have determined that

8    he committed a robbery and, therefore, he would not have been found guilty of

9    felony murder.

10        As a general rule, the Ninth Circuit has held that "the failure of a state

11    court to instruct on a lesser offense [in a non-capital case] fails to present a

12    federal constitutional question and will not be considered in a federal habeas

13    corpus proceeding."  *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).  An

14    exception to this rule may arise when the lesser included offenses "are

15    consistent with defendant's theory of the case" and where substantial evidence

16    warrants the instruction on the lesser included offense.  *Id.* at 929; *see also*

17    *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986) (finding due process

18    violation where "the jury was not given the option of finding him guilty of the

19    lesser included noncapital offense of second degree murder even though the

20    evidence would have supported such a verdict").  However, in this case,

21    Petitioner was not charged with robbery, but was instead charged with felony

22    murder involving an underlying robbery.  Hence, theft is not a lesser-included

23    offense of felony murder and there is nothing constitutionally infirm in the trial

24    court's failure to charge the jury on theft.

25        Moreover, Petitioner's claim fails because the overall jury instructions

26    adequately defined the specific intent for robbery and the essential elements

27

28                                        10

necessary for a finding of felony murder.  The jury was specifically instructed
that the crime of felony murder requires that the "unlawful killing" must
"occur[] [during the commission or attempted commission of the crime] of
Robbery."  CT at 5264.  The jury instructions defined robbery as the taking of
another's personal property "with the specific intent permanently to deprive that
person of the property" and accomplished "against the will of that person."  CT
at 5272.  The Court of Appeal considered the instructions given to the jury as a
whole and found that they adequately conveyed the issue of the timing of the
formation of the intent to steal.  *Craft,* 2003 WL 1889986 at *14.

Petitioner misunderstands the legal standard by contending that "it was
not robbery if the decedent's property was taken after his death."  Petition at 15.
Taking property will still be robbery even if the belongings were stolen after the
killing as long as the intent to steal arose either before or during the murder.  If
the jury had found that Petitioner's intent to steal from the victim did not arise
until after the murder, then there was no killing during the commission or
attempted commission of robbery and there would have been no finding of
felony-murder.  *See People v. Lewis,* 25 Cal. 4th 610, 647 (Cal. 2001).

Further, there was sufficient evidence for the jury to reasonably
determine that Petitioner had intended to rob Hebert prior to killing him.
Petitioner admitted to stealing reptiles, rock crystals, and a dragon statue from
the Sackses' in order to buy drugs.  *Craft*, 2003 WL 1889986 at *4.  Petitioner
knew that Hebert had just picked up some food stamps and that Hebert had
returned with cash from working on a plumbing job in San Francisco for two
weeks.  *Id.*  Hebert's empty wallet was later found in Petitioner's bedroom, an
empty fanny pack was found near Hebert's body, and Petitioner had taken
Hebert's bicycle and duffle bag and given them to Willie Harris.  *Id.*  These

11

1    facts alone support a jury finding that Petitioner's intent to steal was formed

2    prior to the commission of the murder.  *See People v. Marshall*, 15 Cal. 4th 1,

3    35 (1997) ("If a person commits a murder, and after doing so takes the victim's

4    wallet, the jury may reasonably infer that the murder was committed for the

5    purpose of obtaining the wallet, because murders are commonly committed to

6    obtain money").

7         Petitioner's reliance on *People v. Ramkeesoon*, 39 Cal. 3d 346 (1985), is

8    not instructive.  Here, there was no fear of an "unwarranted all-or-nothing

9    choice" that would have guaranteed robbery and felony-murder convictions

10   irrespective of intent.  *Ramkeesoon*, 39 Cal. 3d at 352.  The Court of Appeal

11   considered Petitioner's arguments and found that the failure to instruct on the

12   lesser did not violate his rights because the jury was not forced into such a

13   choice.  *People v. Craft*, 2003 WL 1889986 at *14. First, Petitioner was not

14   actually charged with robbery and so the jury was not forced to choose between

15   robbery or theft.  The instruction on robbery was only provided as relevant in

16   connection with the felony-murder charge.  *Id.*  Second, if the jury found that

17   Petitioner did not commit the requisite robbery for a first-degree felony murder,

18   they still could have found Petitioner guilty of second-degree murder.  *Id.;* CT

19   at 5266, 5308.  The Court of Appeal appropriately distinguished the present case

20   from *Ramkeesoon* by noting that "[t]he rule requiring the trial court to instruct

21   the jury sua sponte on theft as a lesser offense applies when the defendant has

22   been charged with the greater offense of robbery."  *People v. Craft*, 2003 WL

23   1889986 at *14.

24         Because the jury instructions were clear on the necessary elements of

25   robbery and "juries are presumed to follow their instructions," *Richardson v.*

26   *Marsh*, 481 U.S. 200, 211 (1987), there is no risk that any alleged omission in

27

28                                    12

1    failing to instruct on theft as a lesser-included offense amounted to

2    constitutional error.

3    **B.  Violation of Miranda Rights**

4           Petitioner claims that the trial court erred in not suppressing his statement

5    to police on January 15, 1997 because the statement was involuntary and

6    violated *Miranda v. Arizona*, 384 U.S. 444 (1968).  During his police interview,

7    Petitioner admitted to being a felon in possession of a firearm, CT at 3943, to

8    using crack, CT at 3955, and to trading stolen snakes for an "[e]ight ball of

9    crank," CT at 4026.  Petitioner asserts that these admissions were coerced

10   because "the officers declined to give appellant information about his property

11   to which he was entitled until or unless he talked to them."  Petition at 32.

12   Additionally, Petitioner contends his statement was involuntarily made since he

13   was unaware that he was being questioned as the prime suspect in a murder

14   investigation.  *Id.* at 34.

15          **1.   Legal Standard**

16          In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that

17   a person subjected to custodial interrogation must be advised that he has the

18   right to remain silent, that statements made can be used against him, that he has

19   the right to counsel, and that he has the right to have counsel appointed.  These

20   warnings must precede any custodial interrogation, which occurs whenever law

21   enforcement officers question a person after taking that person into custody or

22   otherwise significantly deprive a person of freedom of action.  *Id* at 444.

23          The requirements of *Miranda* are "clearly established" federal law for the

24   purposes of federal habeas corpus review under 28 U.S.C. 2254(d).  *Juan H. v.*

25   *Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d

26   1002, 1009 (9th Cir. 2004).  The Ninth Circuit held that: (1) *Miranda* violations

27

28                                                13

are properly considered in federal habeas proceedings and (2) where statements

are used as evidence of guilt and there is no proper instruction to the jury

regarding the limited use of such statements, there is the possibility of federal

constitutional error. *Hinman v. McCarthy*, 676 F.2d 343, 348-49 (9th Cir.), *cert.*

*denied,* 459 U.S. 1048 (1982).[7]

Once properly advised of his rights, an accused may waive them

voluntarily, knowingly, and intelligently. *Miranda,* 384 U.S. at 475. The

government must prove waiver by preponderance of the evidence. *See*

*Colorado v. Connelly*, 479 U.S. 157, 168-9 (1986).  The waiver need not be

express and may be inferred where defendant understands his rights and

undertakes a course of conduct indicating waiver. *North Carolina v. Butler*, 441

U.S. 369, 373 (1979).  In determining whether a defendant's will was overborne

and a statement was involuntary, the reviewing court must assess the totality of

the circumstances surrounding the interrogation. *Schneckloth v. Bustamonte*,

412 U.S. 218, 226 (1973).  Although the burden is on the government to prove

voluntariness, a waiver cannot be held involuntary absent official compulsion or

coercion. *See Connelly*, 479 U.S. at 170.  A statement is involuntary and

subject to exclusion if it was the product of physical or psychological coercion

on the part of the police. *Rogers v. Richmond,* 365 US 534, 540 (1960).

The remedy for a violation of Miranda rights is the suppression, at the

subsequent trial, of the incriminating statements the defendant made during

questioning. *Miranda*, 384 U.S. at 479. Habeas relief should be granted if the

---

[7] Although the exclusionary rule under *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976), bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims, this jurisdictional restriction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 686-95 (1993).

1    admission of statements in violation of *Miranda* "had substantial and injurious

2    effect or influence in determining the jury's verdict." *Jackson,* 364 F.3d at 1010

3    (quoting *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)).

4        **2.   Analysis**

5        Petitioner alleges that his statement to police was in violation of his

6    *Miranda* rights and was made pursuant to coercive police tactics.  Petitioner was

7    being held in custody pursuant to an outstanding warrant on an unrelated charge

8    on August 15, 1997 and, prior to waiving his *Miranda* rights, Petitioner claims

9    he asked the police about the items seized from the Madden's property.

10   According to Petitioner, the police stated that "it would all work out" and then

11   gave Petitioner his *Miranda* warning.  Petition at 31.  Petitioner claims these

12   tactics were deceptive and coerced him into waiving his *Miranda* rights in order

13   to learn about his seized property.

14       There is no evidence in the record to support Petitioner's claim that his

15   incriminating statements were obtained in violation of his *Miranda* rights.

16   Petitioner presents no evidence that "the officers declined to give appellant

17   information about his property to which he was entitled until or unless he talked

18   to them."  Petition at 32.  To the contrary, the police officers never expressly

19   stated that they would provide Petitioner with additional information regarding

20   his property if he waived his *Miranda* rights.  Petitioner was already aware "that

21   everything he owned was taken by the police" pursuant to a search warrant, *Id.*

22   at 31; CT at 3924, so there is no merit to Petitioner's claim that knowing which

23   items had been seized would affect his *Miranda* waiver.  Even accepting

24   Petitioner's version of events, there is nothing coercive or overbearing in the

25   police statements that they planned to discuss his property during the interview.

26   Petition at 31.  A lack of complete candor does not amount to coercion and does

27   not render Petitioner's *Miranda* waiver involuntary.

28
                                    15

1    In response to Petitioner's inquiry, the police assured Petitioner that, "[i]f

2    it all comes out right, you'll get [your property] all back, naturally." CT at 3925.

3    It is not clear what additional information Petitioner expected the police to

4    provide.  Petitioner incorrectly cites to the California Penal Code for the

5    proposition that due process required the police officers to furnish him with the

6    search warrant.  Petition at 35.  A copy of the search warrant was left with Allen

7    Madden at the time of the seizure and there is no additional requirement that

8    Petitioner be provided a copy of the search warrant.  Cal. Penal Code § 1535;

9    *see People v. Calabrese*, 101 Cal. App. 4th 79, 84 (2002) (citing *City of West*

10   *Covina v. Perkins*, 525 U.S. 234, 242-43 (1999) ("The United States Supreme

11   Court has not interpreted the Fourth Amendment to the United States

12   Constitution as requiring the officer executing the search warrant to display the

13   warrant or provide defendant a copy of it").

14   To determine voluntariness of a statement under *Miranda*, courts may

15   consider whether the defendant has previously had "considerable experience

16   with the police."  *Fare v. Michael C*., 442 U.S. 707, 726 (1979).  Petitioner

17   conceded that he had previous police dealings and, in referencing his prior

18   North Carolina murder conviction (*see infra* Section G), Petitioner stated,

19   "[s]ome years ago I went through a homicide deal so I know what, what's going

20   on and you were asking me questions and I answered them the best I could."

21   CT at 3914 (Transcript of Charles Craft Interview, Jan. 15, 1997.)

22   Petitioner further alleges that his admissions would not have been made

23   if he had known he was a murder suspect.  Petitioner states that "he never would

24   have spoken to law enforcement because it was obvious from the fact of the

25   search warrant that the items being search [sic] for related to a murder."

26   Petition at 31. Citing Supreme Court precedent, the Court of Appeal found that

27   "interrogating officers need not divulge the exact charges being investigated."

28

16

*People v. Craft*, 2003 WL 1889986 at *9 (citing *Colorado v. Spring*, 479 U.S. 564, 576 (1986)).  Petitioner was at all times aware of Hebert's murder and, during the interview, Petitioner actually volunteered information about Hebert's murder before the police began questioning him.  The investigating officer repeatedly told Craft that he was the "one that brought up homicide."  CT at 3915-17.  In the course of the lengthy interview, Craft explicitly expressed his intent to cooperate with the police and stated, that "here's a homicide investigation.  I don't have any idea of what's going on.  I'll work with you on that, you ask me specific questions."  CT at 3912.  Even if the police had withheld information about Petitioner's property, Petitioner's awareness of an ongoing homicide inquiry and his prior experience as a murder suspect make it doubtful that he would waive his *Miranda* rights in a murder investigation just to ascertain the whereabouts of his property, including kitchen equipment and tools.  CT at 3925.

The Court of Appeal determined that Petitioner's will to exercise his right to remain silent was not overborne by coercive police tactics or the failure to disclose that he was a suspect in a murder investigation.  There was no indication from Petitioner's background or characteristics that he was incapable of fully comprehending that he was waiving his Miranda rights by making a statement to the police.  It is uncontested that the police gave Petitioner his *Miranda* warnings and that Petitioner did agree to speak with the police.  As the Court of Appeal correctly noted, "[t]he absence of a response to defendant's question about the property in the hands of the authorities did not invalidate defendant's waiver."  *Id.* at *9.

In considering the totality of the circumstances, the Court of Appeal determined that there was no improper coercion by the suggestion of the police that he would learn the whereabouts of his property in the course of the

17

1    interview and Petitioner at all times knew he had the right to remain silent.  This

2    Court finds that the Court of Appeal's conclusion that Petitioner voluntarily

3    waived his Miranda rights by making a statement and was not overborne by

4    coercive police tactics is consistent with controlling federal law.

5    **C.    Admission of Evidence of Drug Use and Drug Sales**

6         Petitioner argues that, even if his statement to police was properly be

7    admitted, his damaging statements regarding drug use and drug sales should not

8    have been allowed into evidence.  Petitioner claims that the trial court's

9    admission into evidence of several prior uncharged incidents of his drug use and

10   drug sales denied him the fair trial guaranteed by the Due Process Clause.  At

11   trial, Petitioner unsuccessfully moved to exclude all references to his use and

12   sale of drugs.  RT at 3078.  The court found the evidence to be relevant to his

13   motive to commit the murder and allowed the evidence to be presented. RT at

14   3084-86.

15        **1.    Legal Standard**

16        A state court's procedural or evidentiary ruling is not subject to federal

17   habeas review, however, unless the ruling violates federal law, either by

18   infringing upon a specific federal constitutional or statutory provision or by

19   depriving the defendant of the fundamentally fair trial guaranteed by due

20   process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*,

21   926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot

22   disturb on due process grounds a state court's decision to admit evidence of

23   prior crimes or bad acts unless the admission of the evidence was arbitrary or so

24   prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*,

25   45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th

26   Cir.), *cert. denied*, 479 U.S. 839 (1986).  The Supreme Court has upheld the use

27   of prior illegal acts to show motive, planning, intent and other states of mind in

28                                              18

1  the presently charged crimes. *Lisenba v. California,* 314 U.S. 219, 227 (1941).

2      In California, the state court's admission of evidence generally "depends

3  upon three principal factors: (1) the *materiality* of the fact sought to be proved

4  or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the

5  material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion

6  of relevant evidence." *People v. Robbins*, 45 Cal. 3d 867, 879 (1988) (quoting

7  *People v. Thompson*, 27 Cal. 3d 303, 315 (1980)).

8      **2. Analysis**

9      The admission of other crimes evidence violates due process only

10  if there were no permissible inferences the jury could have drawn from the

11  evidence (in other words, no inference other than conduct in conformity

12  therewith). *See McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993);

13  *Jammal*, 926 F.2d at 920. And even so, the evidence must be of such highly

14  inflammatory or emotionally charged quality as necessarily prevents a fair trial.

15  *See McKinney*, 993 F.2d at 1384-85; *Jammal*, 926 F.2d at 920-21. That was not

16  the case here. The evidence of petitioner's prior drug use and sales was

17  probative of petitioner's intent and motive, and not so highly inflammatory or

18  emotionally charged as to necessarily prevent a fair trial. *See id.*

19      Relying on the comparable fact pattern in *People v. Felix*, 23 Cal. App.

20  4th 1385, 1392 (1994), the Court of Appeal found that "a direct and logical

21  connection was made between defendant's admitted drug use and the charged

22  offenses." *People v. Craft*, 2003 WL 1889986 at *10. That Petitioner had

23  previously stolen from the Sackses in order to buy drugs permitted both the

24  inference that he stole from them here and that he was motivated to rob and kill

25  Hebert for drug money. *Id.* A further connection was found through the

26  evidence that Petitioner had told Allen Madden that he killed Hebert because he

27  was going to report to the Sackses that Petitioner was selling drugs. *People v.*

28                                    19

1    *Craft*, 2003 WL 1889986 at *10.  At trial, Petitioner's counsel argued that the

2    admission of drug use "is highly prejudicial and any probative value is

3    substantially outweighed by the prejudice."  RT at 3018, 3092; *see* Cal. Evid.

4    Code § 352.  The court denied the defense's request and stated that "the People

5    feel that they need it for their case and they are going to argue what it means,

6    and whether the jury believes it or whether they don't is your business."  RT at

7    3086.  The trial court held that the Petitioner's drug use and sales created a

8    permissible inference in demonstrating motive and we agree.  *See* Cal. Evid.

9    Code § 1101(b).

10          This Court is satisfied that proof of Petitioner's motive was a clearly

11   material fact, that there was a strong tendency that evidence relating to

12   Petitioner's drug activity could prove motive, and the probative value

13   outweighed any prejudicial effect.  *See Robbins*, 45 Cal. 3d at 879.  The jury

14   instructions explicitly stated:

15               "Evidence has been introduced for the purpose of showing
             that the defendant committed [a crime] other than that for which
16           [he] is on trial
                 [This] evidence, if believed, [may not be considered by you
17           to prove that defendant is a person of bad character or that [he] has
             a disposition to commit crimes.  It may be considered by you
18           [only] for the limited purpose of determining if it tends to show:...
                 [The existence of the intent which is a necessary element of
19           the crime charged;]
                 [A motive for the commission of the crime charged;]...
20               For the limited purpose for which you may consider such
             evidence, you must weigh it in the same manner as you do all
21           other evidence in the case"

22   CT at 5242.  Because we must presume the jury followed instructions,

23   *Richardson*, 481 U.S. at 211, these limiting instructions about the admission of

24   past crimes further minimized any prejudicial impact.

25          It simply cannot be said that the state courts' rejection of petitioner's

26   claim was contrary to, or involved an unreasonable application of, clearly

27   established Supreme Court precedent, or that it involved an unreasonable

28                                          20

determination of the facts.  *See* 28 U.S.C. § 2254(d).  The California Court of

Appeal reasonably concluded that the admission of the evidence of Petitioner's

drug activity did not render petitioner's trial fundamentally unfair in violation of

due process, "which means that the state court's determination to that effect

must stand."  *Early v. Packer*, 123 S. Ct. 362, 366 (2002).

**D.     Refusal to Grant Access to Personnel Record**

Petitioner contends the trial court violated his right to due process and to

confrontation by denying his motion, during trial, for discovery of police

personnel records.  Based on the discovery of a romantic relationship between

Lake County Sheriff's Deputy David Perry and Jennifer Garcia, whose father

owned the property where Craft's belongings were seized, Petitioner moved for

the disclosure of Perry's personnel file.

**1. Legal Standard**

Under California's *Pitchess* procedure, a criminal defendant has a limited

right to discovery of peace officer personnel records, specifically of complaints

made against the officer.  *Pitchess v. Superior Court*, 11 Cal. 3d 531 (1974).

The procedure has been codified.  *See* Cal. Penal Code § 832.7, 832.8; Cal.

Evid. Code §§ 1043-1045.  The *Pitchess* procedure follows two steps.  First, the

defendant must make a written motion for peace officer personnel records that

describes the records sought and that is supported by "affidavits showing good

cause for the discovery or disclosure sought, setting forth the materiality thereof

to the subject matter involved in the pending litigation and stating upon

reasonable belief that such governmental agency identified has the records or

information from the records."  *California Highway Scavone- Nancerol v.

Superior Court*, 84 Cal. App. 4th 1010, 1019-20 (Cal. Ct. App. 2000); Cal.

Evid. Code § 1043.  Second, if a showing of good cause is made, the trial court

will conduct an in camera review of the records to determine whether they are

1   relevant to the current proceedings.  *Id*; Cal. Evid. Code § 1045.

2          In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that

3   "the suppression by the prosecution of evidence favorable to an accused upon

4   request violates due process where the evidence is material either to guilt or to

5   punishment, irrespective of the good faith or bad faith of the prosecution."  373

6   U.S. at 87.  The Ninth Circuit has found that the *Pitchess* preliminary

7   requirement of good cause complies with Supreme Court precedent under *Brady*

8   (as modified in *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n. 15 (1987)) and has

9   held that California's procedure is not contrary to Supreme Court precedent.

10   *Harrison v. Lockyer*, 316 F.3d 1063, 1066 (9th Cir. 2003) ("We are not

11   instructed on how a defendant in a criminal case will know, or be able to make,

12   a preliminary showing that a police personnel file contains evidence material to

13   his defense.  But we are clear that the California Supreme Court has faithfully

14   followed the United States Supreme Court [in requiring such a showing]").

15          **2.  Analysis**

16          Petitioner claims that the trial court's denial of his *Pitchess* motion

17   violated his constitutional rights to due process and to confront witnesses

18   against him.  The only federal question presented by Petitioner is whether he

19   was denied access to favorable and material evidence under *Brady*.  During the

20   trial, Petitioner filed a motion to discover the personnel records of Deputy Perry.

21   The motion was "based on the discovery that Deputy Perry of the Lake County

22   Sheriff's Department had been dating [prosecution witness] Allen Madden's

23   daughter, Jennifer (Garcia), at the time of the investigation, that during that

24   intimate relationship Deputy Perry shared information about the case with Ms.

25   Garcia, and that Deputy Perry had been disciplined."  *People v. Craft*, No.

26   A92932, 2003 WL 1889986 at *11 (Cal. Ct. App. April 17, 2003).

27          The trial court found that Petitioner satisfied the first prong under

28                                                22

*Pitchess* by establishing good cause and proceeded to the second step of conducting an *in camera* hearing.  Based on this hearing, the trial court did provide defense counsel with some telephone logs from the personnel file that demonstrated phone calls from the jail to the Madden residence, but otherwise denied Petitioner's motion to compel disclosure.  *Id.*

The California Court of Appeal held that the trial court did not abuse its discretion in denying the *Pitchess* motion because "the personnel file contains nothing favorable to the defendant and nothing that undermines the confidence in the outcome of the case."  *Craft*, 2003 WL 1889986 at *12.  To support its finding, the Court of Appeal emphasized that the relationship between Officer Perry and Jennifer Madden began after the seizure from the Maddens' yard and therefore could not have affected Allen Madden's cooperation with the seizure. Further, the affair between Officer Perry and Jennifer Garcia was used by defense counsel at trial to impeach both Officer Perry and Allen Madden.  *Id.*

The factual findings by state courts are "presumed to be correct."  28 U.S.C. § 2254(e)(1).  To rebut this presumption, Petitioner must provide clear and convincing evidence that the state courts' determination of the facts was erroneous.  Here, Petitioner only presents conclusory allegations that the denial of his *Pitchess* motion amounts to constitutional deprivation.  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).  Petitioner has not established a *Brady* violation.  Giving deference to the trial and appellate court review of the *in camera* transcripts and sealed personnel file, Petitioner has not established that the requested personnel information contained material or favorable evidence and there was no constitutional due process violation.  *See U.S. v. Bagley*, 473

23

U.S. 667, 674-75 (1985).[8]  This Court is persuaded by the foregoing analysis that the denial of the discovery motion filed by Petitioner did not violate his constitutional rights.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E.   **Ineffective Assistance of Counsel for Failure to Request Mistrial**

Petitioner alleges ineffective assistance of counsel as a result of defense counsel's failure to request a mistrial following a witness's inadvertent admission of Petitioner's prison history.  During the guilt phase at trial, witness Annilee Allen let slip that Petitioner told her that "he just got out of prison for murder."  RT at 1871.  Defense counsel immediately moved to strike the answer and the trial court admonished the jury to disregard any stricken testimony.  RT at 1901; 2005.

#### 1. Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Strickland*, 466 U.S. at 686.

In order to prevail on a Sixth Amendment ineffectiveness of counsel

---

[7]  Petitioner also argued that the failure to grant the discovery motion violated his Sixth Amendment right of confrontation.  The Supreme Court has explained that the denial of discovery requests should be reviewed under the Due Process Clause rather than the Confrontation Clause.  *See Pennsylvania v. Ritchie*, 480 U.S. at 51-56.

24

1    claim, Petitioner must establish two things.  First, Petitioner must establish that

2    counsel's performance was deficient and fell below an "objective standard of

3    reasonableness" under prevailing professional norms.  *Strickland,* 466 U.S. at

4    687-88.  Second, Petitioner must establish that he was prejudiced by counsel's

5    deficient performance and that "there is a reasonable probability that, but for

6    counsel's unprofessional errors, the result of the proceeding would have been

7    different." *Id.* at 694.  A reasonable probability is a probability sufficient to

8    undermine confidence in the outcome. *Id.*  The *Strickland* framework for

9    analyzing ineffective assistance of counsel claims is considered "clearly

10   established Federal law, as determined by the Supreme Court of the United

11   States" for the purposes of 28 U.S.C. § 2254(d) analysis

12        **2. Analysis**

13        Petitioner claims that his defense counsel's failure to request a mistrial

14   after evidence was inadvertently admitted about his criminal history constitutes

15   ineffective assistance of counsel.  Defense counsel's decision not to request a

16   mistrial was not unreasonable and does not fall below an objective standard of

17   reasonableness under prevailing professional norms.  Petitioner fails to

18   demonstrate how his attorney was incompetent or ineffective and does not

19   satisfy his burden of showing through evidentiary proof that counsel's

20   performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th

21   Cir.), *cert. denied*, 498 U.S. 960 (1990).   Petitioner's claim lacks merit and fails

22   to satisfy either prong under *Strickland.*

23        In the first instance, trial counsel was not deficient for failing to request a

24   mistrial.  As the Court of Appeal noted, "a motion for mistrial presupposes that

25   the effect of the objectionable evidence was so prejudicial as to be incurable by

26   merely striking it and admonishing the jury to disregard it." *Craft*, 2003 WL

27   1889986 at *13.  Here, the witness's admission about Petitioner's prison history

28                                         25

1    was curable by the court's admonition.  The trial court specifically instructed:

2        "I might also tell you now and then I will read some law to
         you that might be an admonishment.  If I strike anything from
3        the record and I read the law to you that you must treat that as
         though you had never heard of it, all right, and that is the
4        language they use, so any time I do strike any testimony, that
         shouldn't enter into your deliberations and you should treat it
5        as though you never heard of it."

6    RT at 2005.  Petitioner contends that defense counsel was ineffective for only

7    requesting that the court strike the statement from the record and not moving for

8    a mistrial.  Even the cases Petitioner cites for support only address ineffective

9    assistance for failing to object or request that damaging evidence be stricken,

10   rather than failure to move for mistrial.  *See* Petition at 54; *People v. Torres*, 33

11   Cal. App. 4th 37, 48-49 (1995); *People v. Sandlee*, 70 Cal. App. 3d 477, 482-83

12   (1977).

13       Petitioner's claim additionally fails under the *Strickland*'s second prong,

14   since Petitioner has not established that prejudice resulted from the failure to

15   request a mistrial.  *See U.S. v. Gibson*, 690 F.2d 697, 703-04 (9th Cir. 1982)

16   (holding no ineffective assistance for failing to object or strike testimony where

17   Petitioner made no showing of prejudice).   To demonstrate prejudice for failure

18   to file a motion, Petitioner "must show that (1) had his counsel filed the motion,

19   it is reasonable that the trial court would have granted it as meritorious, and (2)

20   had the motion been granted, it is reasonable that there would have been an

21   outcome more favorable to him."  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir.

22   1999).  Petitioner presents no reasonable likelihood that, had counsel requested

23   a mistrial, the court would have granted the motion.

24       Further, there is no evidence that Annilee Allen's statements were

25   prejudicial enough to create a "reasonable likelihood" that it adversely affected

26   the jury's verdict.  First, Allen admitted at the outset of the interview that she

27   was feeling "[n]ervous and emotional" and was also accompanied by a friend

28                                          26

during her testimony.  RT at 1865.  The statement about Petitioner's history was made in the context of the witness's testimony that Craft may have been exaggerating his past and trying to impress her with his gun.  RT at 1871.

Petitioner relies largely on *People v. Ozuna* as evidence that jury admonitions may be insufficient to cure damaging admissions.  *Ozuna,* however, is readily distinguishable from this case.  *Ozuna* focused on the element of prosecutorial misconduct and the "calculated" testimony that was "produced to prove defendant's debased character and criminal disposition."  *People v. Ozuna*, 213 Cal. App. 2d 338, 342 (1963).  Here, Annilee Allen's statement was an unexpected and accidental response to defense counsel's questioning.  *See People v. Jennings*, 53 Cal. 3d 334, 374-75 (1991) (distinguishing from *Ozuna* where defendant's criminal history was not "*intentionally* elicited from a prosecution witness by the deputy district attorney").  In Petitioner's case, the judge immediately struck the statement from the record and provided an elaborate admonition the following day.

As the Court of Appeal correctly noted, "the evidence of defendant's guilty was so strong that the jury was not likely to have been influenced in its view of the facts by the slip by Ms. Allen."  *Craft*, 2003 WL 1889986 at *13; *see Luna v. Cambra*, 306 F.3d 954, 966-67  (9th Cir. 2002) ("we must consider the relative strength of the prosecution's case in analyzing whether counsel's errors prejudiced [Petitioner]").  Because we find that the witness's admission was "an isolated incident in a very long trial and we are persuaded that the trial court's prompt and vigorous admission was effective to cure any prejudice," *People v. Price*, 1 Cal. 4th 324, 454-55 (1991), we deny Petitioner's *Strickland* claim.

**F.    <u>Cumulative Error</u>**

Petitioner claims that even if the errors in his trial did not separately

27

cause him sufficient prejudice, the cumulative effect of the errors made his trial fundamentally unfair.

### A.   Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford,* 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  But, where no single constitutional error exists, nothing can accumulate to the level of a constitutional violation requiring reversal of petitioner's conviction.  *See Mancuso v. Olivarez,* 292 F.3d 939, 957 (9th Cir. 2002).  Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal); *see, e.g., Thomas v. Hubbard,* 273 F.3d. 1164, 1180 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).

### B.   Analysis

This Court has not found that the state courts violated Petitioner's constitutional rights by denying his claims.  Since we find no constitutional errors, there can be no cumulative effect of constitutional error.  *Mancuso,* 292 F.3d at 957.   Additionally, any potential errors were found by the state court and this court to be harmless.  As set forth above, the prosecution's case against

Petitioner was strong. *Cf. Frederick*, 78 F.3d at 1381. Petitioner's case is not one of the rare cases in which cumulative errors denied him a fair trial. *Cf. Alcala*, 334 F. 3d at 893-95. Therefore, this Court denies Petitioner's claim for relief on the basis of cumulative error.

### G.   Out-of-State Conviction

Finally, Petitioner claims that his prior murder conviction in North Carolina should not have been used as the basis of his special circumstances conviction here. Petitioner argues that the elements for second-degree murder in North Carolina differ from those in California and that his North Carolina conviction does not fit the definition for second-degree murder in California as required under California law. Petitioner contends that he would not have been sentenced to life without possibility of parole if the jury had not found true the special circumstance of Petitioner's prior murder. Petition at 58.

#### 1. Legal Standard

Under California law, if it is necessary to review the record of a prior criminal proceeding in order to determine whether a prior conviction qualifies under California's various sentencing enhancement statutes, the responsibility for this inquiry falls upon the court, rather than the jury. *People v. McGee*, 38 Cal.4th 682 (2006). While there is no federal constitutional right to a jury trial on the fact of a prior conviction, *United States v. Zepeda*, 234 F. 3d 411, 414-15 (9th Cir. 2001), *cert. denied,* 532 U.S. 966 (2001), California law provides a criminal defendant with a statutory right to have a jury determine "whether or not the defendant has suffered the prior conviction." Cal. Penal Code § 1025(b) (2001); *Dillard v. Roe*, 244 F.3d 758, 769 & n.13 (9th Cir. 2001). In 1997, however, the controlling statute was amended to also provide that the court, rather than the jury, shall determine "whether the defendant is the person who has suffered the prior conviction," except when the prior conviction is charged

as an element of the offense or as a special circumstance pursuant to Penal Code

§ 190.2. *See* Cal. Penal Code § 1025(c), (d) (2001); *Dillard*, 244 F.3d. at 770

n.15.  Under Penal Code § 190.2, special circumstances may be found where,

> (2) The defendant was convicted previously of murder in the first
> or second degree.  For purposes of this paragraph, an offense
> committed in another jurisdiction, which if committed in
> California would be punishable as first or second degree murder,
> shall be deemed murder in the first or second degree.

Cal. Penal Code § 190.2(a)(2).

### 2. Analysis

Petitioner concedes that he was convicted of second-degree murder in

North Carolina in 1975, but contends that this prior conviction should not have

been used as a sentencing enhancement.  According to Petitioner, the definition

of malice differs in North Carolina and California and his prior conviction in

North Carolina would not be considered a second-degree murder in California.

Petition at 61-62.  The California Court of Appeal considered the elements of

each state's statute and found that the mental state required under North

Carolina law is equivalent to the "express and implied" forms of malice under

California's second degree murder statute.  *Craft*, 2003 WL 1889986 at *15.

Because this Court finds that the elements of second-degree murder in North

Carolina and California are virtually identical, the trial court correctly admitted

Petitioner's prior conviction and Petitioner has not established that he is entitled

to relief for any constitutional violation.

The only Supreme Court precedent Petitioner offers to support his

argument of a constitutional violation is one in which the prior conviction itself

was constitutionally defective.  *See U.S. v. Tucker*, 404 U.S. 443 (1972).  In this

case, however, Petitioner does not challenge the constitutionality of his prior

murder conviction and only disputes the California state courts' interpretation of

state law.  On its face, this does not appear to state a claim cognizable under

federal habeas review.  *See Hendricks v. Zenon*, 993 F.2d 664, 674 (9th Cir. 1993) ("[Petitioner] cites no authority for the proposition that a state appellate court's refusal to reverse a sentence on state law grounds is a violation of federal due process guarantees").

Nor does Petitioner's reliance on *People v. Maldonado*, 186 Cal. App. 3d 863 (1986), as "highly analogous" support his claim of a constitutional violation.  Petition at 63.  In *Maldonado*, the court found that the minimum elements for malice in Texas did not satisfy the California standard for malice aforethought since "[t]here was no requirement that the defendant had been *subjectively* aware of the risk created; it was sufficient that a reasonable person would have been aware of the risk."  *Id.* at 866.  Petitioner provides no evidence of any comparable material difference between the elements of second-degree murder in California and North Carolina.

Petitioner misstates the legal standard under *In re Christian S.*, 7 Cal. 4th 768, 778 (1994), by claiming that malice in California always requires a "wrongful intent."  Petition at 60.  While this is the standard for express malice under California Penal Code, Section 188, Petitioner ignores the elements of implied malice.  Implied malice arises "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  Ca. Penal Code § 188.  The Court of Appeals correctly noted that North Carolina's standard is equivalent and, while not explicitly calling it implied malice, states that malice exists "when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief."  *Craft*, 2003 WL 1889986 at *15 (quoting *State v. Reynolds*, 297 S.E. 2d 532, 536 (N.C. 1982).  We agree with the Court of Appeals holding that the North Carolina conviction properly qualified for the

31

1  special circumstance finding since "[w]e can discern no distinction between the
2  element of malice required under North Carolina law and the element required
3  by California law." *Craft*, 2003 WL 1889986 at *15. Petitioner is therefore not
4  eligible for relief on this claim.

5                                **CONCLUSION**

6          The state court's denial of Petitioner's habeas petition is not contrary to
7  or an unreasonable application of established federal law as determined by the
8  Supreme Court. Therefore, Petitioner's petition for writ of habeas corpus must
9  be DENIED. The Clerk shall enter judgment and close the file.

10         IT IS SO ORDERED.

11  DATED: October 24, 2007

                                      _____
12                                    JEFFREY S. WHITE
                                      United States District Judge

1               UNITED STATES DISTRICT COURT

2                         FOR THE

3            NORTHERN DISTRICT OF CALIFORNIA

4

5
   CRAFT,

6                                 Case Number: CV04-04226 JSW

             Plaintiff,

7                            **CERTIFICATE OF SERVICE**

     v.

8
   STRATTON et al,

9
             Defendant.

10    —————————————————/

11
   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District

12   Court, Northern District of California.

13   That on October 24, 2007, I SERVED a true and correct copy(ies) of the attached, by placing
    said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by

14   depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
    delivery receptacle located in the Clerk's office.

15

16

17   Catherine Amy Rivlin
    California Attorney General

18   Criminal Appeals, Writs & Trials
    455 Golden Gate Avenue

19   Suite 11000
    San Francisco, CA 94102-7004

20
   Charles L. Craft

21   P96662
    P.O. Box 5103

22   Delano, CA 93216

23   Dated: October 24, 2007           *Jennifer Ottolini*

24                          Richard W. Wieking, Clerk
                           By: Jennifer Ottolini, Deputy Clerk

25

26

27

28